## A01A1564, A01A1566. ATLANTA JOURNAL-CONSTITUTION et al. v. JEWELL (two cases).
## A01A1565. JEWELL v. COX ENTERPRISES, INC. et al.
### (555 SE2d 175)

JOHNSON, Presiding Judge.

These cases arise from coverage by the Atlanta Journal-Constitution of the 1996 bombing in Centennial Olympic Park and Richard Jewell's involvement in that incident. The initial media coverage of the Olympic Park bombing portrayed Jewell as a hero for his role in discovering the bomb, alerting authorities, and evacuating bystanders from the immediate vicinity, no doubt saving lives. Subsequently, however, the Federal Bureau of Investigation (FBI) focused its investigation on Jewell. The resulting media coverage of the criminal investigation caused Jewell and his family considerable anguish, while converting Jewell's status from hero to suspect. The investigation ultimately cleared Jewell of any involvement in the bombing. And through subsequent media coverage of the investigation, his role in these events has once again been depicted as the positive role it was originally believed to be.

In Case No. A01A1564, the Atlanta Journal-Constitution seeks review of a June 1999 trial court order holding two of its reporters in contempt and ordering them incarcerated indefinitely for failing to disclose the identities of confidential news sources who provided information regarding Jewell's status in the Olympic Park bombing investigation.[1] In Case No. A01A1565, Jewell seeks review[2] of an October 1999 trial court order finding him to be a limited-purpose public figure for purposes of his defamation action. In Case No. A01A1566, the Atlanta Journal-Constitution seeks review of the trial court's refusal to grant its motion for judgment on the pleadings and its motion for summary judgment.

### Case No. A01A1564

Throughout this case, the Atlanta Journal-Constitution has consistently refused to provide Jewell with the names of confidential sources who allegedly provided its reporters with information concerning Jewell's status in the investigation of the Olympic Park bombing. On February 26, 1998, Jewell filed a motion to compel discovery, specifically requesting the names of the Atlanta Journal-Constitution's confidential sources. The trial court granted Jewell's motion to compel, finding that no reporter's privilege exists in Geor-

---

[1] One of the two reporters named in the action, Kathy Scruggs, is now deceased. The appeal from the contempt order insofar as it applies to her is moot.

[2] Pursuant to OCGA § 5-6-34 (b).

gia for a reporter in a libel case, where the reporter is also a party to the case. Subsequently, counsel for the Atlanta Journal-Constitution instructed a deponent not to answer questions regarding the confidential informants. On May 8, 1998, the Atlanta Journal-Constitution filed a motion seeking a protective order precluding discovery of the reporters' confidential sources. The trial court denied this motion.

Jewell filed a motion for sanctions, asking that the newspaper and its reporters be held in contempt of court based upon their knowing, wilful, conscious, deliberate, and public refusal to obey the trial court's order requiring them to reveal their confidential sources. On December 15, 1998, and again on March 16, 1999, the trial court ordered the Atlanta Journal-Constitution to reveal information about its confidential sources. The Atlanta Journal-Constitution and its reporters refused to comply with the trial court's orders. As a result of their "willful and continued disobedience," the trial court held the Atlanta Journal-Constitution and the two reporters in civil contempt on June 3, 1999, and ordered the incarceration of the two reporters until such time as they disclosed their confidential sources as required by the trial court's discovery orders. This appeal followed. As to that portion of the appeal regarding defendant Kathy Scruggs, the matter is now moot. As to the remaining defendants, for the reasons discussed below, we vacate the orders requiring disclosure of the reporters' confidential sources, as well as the contempt order, and remand the case to the trial court with direction that it revisit the issue in a manner consistent with this opinion.

1. In every case where a person is charged with contempt of court for alleged violations of a court's order, the legal correctness of the underlying order may be challenged on appeal. However, "if the [trial] court has jurisdiction to make the order, it must be obeyed however wrong it may be"[3] until the order is superseded or vacated.[4] The thrust of the appeal in this case is a challenge to the correctness of the discovery orders compelling the defendants to disclose their confidential sources. Our determination that these underlying orders are erroneous and must be vacated also has the effect of dissolving the civil contempt order which is based upon the violation of these discovery orders.

During discovery Jewell sought the disclosure of certain confidential sources that the Atlanta Journal-Constitution and its reporters relied upon in publishing allegedly defamatory statements. The Atlanta Journal-Constitution argues that these communications are

---

[3] *Pearson v. George*, 211 Ga. 18 (3) (83 SE2d 593) (1954).
[4] See *Gilbert v. E & W Constr. Co.*, 181 Ga. App. 281, 284 (351 SE2d 523) (1986).

privileged and protected by the First Amendment and by statute. Thus, the first issue raised in this appeal is whether the Atlanta Journal-Constitution and its reporters have a privilege against revealing the identification of confidential informants in a case where they are parties. This does not present a new or novel question of law, as it is well settled in the jurisprudence of the United States Supreme Court and the Georgia appellate courts. It has been expressly addressed by an Act of the Georgia Legislature as well. The Atlanta Journal-Constitution and its reporters have no such privilege.

The United States Supreme Court has declined to recognize or create a testimonial privilege for journalists under the First Amendment to the United States Constitution:

> Until now the only testimonial privilege for unofficial witnesses that is rooted in the Federal Constitution is the Fifth Amendment privilege against compelled self-incrimination. We are asked to create another by interpreting the First Amendment to grant newsmen a testimonial privilege that other citizens do not enjoy. This we decline to do.[5]

The Atlanta Journal-Constitution claims that such a privilege is necessary to maintain a free press, but this argument has been considered and rejected by the United States Supreme Court, where Justice White, in his assessment of such an argument, wrote for the Court:

> We are admonished that refusal to provide a First Amendment reporter's privilege will undermine the freedom of the press to collect and disseminate news. But this is not the lesson history teaches us. As noted previously, the common law recognized no such privilege, and the constitutional argument was not even asserted until 1958. From the beginning of our country the press has operated without constitutional protection for press informants, and the press has flourished. The existing constitutional rules have not been a serious obstacle to either the development or retention of confidential news sources by the press.[6]

Georgia's appellate courts have likewise found that the state constitutional right to a free press does not protect a reporter from

---

[5] *Branzburg v. Hayes*, 408 U. S. 665, 689-690 (92 SC 2646, 33 LE2d 626) (1972) (plurality opinion).
[6] Id. at 698-699.

disclosing the identity of a confidential source.[7] Aside from the constitutional issues, both the Supreme Court of Georgia and this Court have consistently held that under Georgia law, there is no common law privilege protecting a reporter's decision to refuse to disclose his or her confidential sources.[8]

As for any statutory privilege, OCGA § 24-9-30 speaks directly to the issue. This statute establishes a qualified privilege for persons engaged in the gathering and dissemination of news. It provides that a reporter does not have to reveal his or her sources unless the privilege has been waived or it is shown that the information sought is material and relevant, cannot be reasonably obtained by other means, and is necessary to the proper presentation or preparation of the case of a party seeking the information, documents, or items.[9]

The trial court correctly concluded, however, that the Atlanta Journal-Constitution and its reporters cannot rely on the qualified privilege established in OCGA § 24-9-30 because the language of the statute specifically provides that this qualified privilege applies only "where the one asserting the privilege is not a party." The qualified privilege simply is not available to one asserting the privilege who is a party to the lawsuit.[10] Since the Atlanta Journal-Constitution and its reporters are named defendants in this action, they cannot rely upon the qualified privilege afforded by OCGA § 24-9-30. In deciding this issue, the trial court properly declined to apply the three-part balancing test set out in the statute. However, as discussed below, other provisions of Georgia law require the trial court to balance the interests of the parties in virtually the same manner as the statute would require if it applied here.

2. Although the Atlanta Journal-Constitution and its reporters may not rely upon any privilege in refusing to reveal the identities of confidential informants in a case where they are parties, the trial court's inquiry does not end there. For although there is no federal or state constitutional privilege, legislative act, or common law which protects against the disclosure of confidential sources, there is a strong public policy in favor of allowing journalists to shield the identity of their confidential sources unless disclosure is necessary in order to meet other important purposes of the law. This public policy is not only reflected in the statute creating the qualified privilege discussed above, but also in jurisprudence regarding the protection of

---

[7] *Howard v. Savannah College &c.*, 259 Ga. 795 (387 SE2d 332) (1990); *Vaughn v. State*, 259 Ga. 325, 326 (1) (381 SE2d 30) (1989).

[8] See *Plunkett v. Hamilton*, 136 Ga. 72, 81-84 (7) (70 SE 781) (1911); *Ga. Communications Corp. v. Horne*, 164 Ga. App. 227, 228 (1) (294 SE2d 725) (1982).

[9] OCGA § 24-9-30.

[10] See *In re Paul*, 270 Ga. 680, 684-685 (513 SE2d 219) (1999).

all sensitive material under the protective order provisions of the discovery rules. Thus, the trial court must consider the general rules regarding protective orders in discovery disputes.

Under OCGA § 9-11-26 (b) (1), a party may obtain only discovery "which is relevant to the subject matter involved in the pending action" and "appears reasonably calculated to lead to the discovery of admissible evidence." A trial court has wide discretion in entering orders to prevent the use of discovery directed to irrelevant or immaterial matter.[11]

Under general discovery rules applicable to all parties, not only must a trial court determine whether the requested discovery is relevant and material, but when parties seek discovery of unprivileged but sensitive materials, the trial court must balance the requesting party's specific need for the material against the harm that would result by its disclosure.[12] Even where a privilege is unavailable, there is a strong public policy favoring the protection of the confidentiality of journalists' sources consistent with that favoring the protection of other types of sensitive information during discovery. Thus, the trial court was obligated under OCGA § 9-11-26 to balance Jewell's need for the identities of the confidential informants against the Atlanta Journal-Constitution's interest in protecting the privacy of the confidential informants and the freedom of the press in general. The Atlanta Journal-Constitution correctly claims the court was obligated to apply this balancing test before requiring it to reveal the identities of its confidential informants.

Jewell claims the Atlanta Journal-Constitution did not properly raise this argument because it did not move for a protective order until after the trial court had ruled on Jewell's motion to compel. However, because the Atlanta Journal-Constitution did assert that Jewell's motion to compel should be denied, arguing that he was not entitled to the information he sought and that its interest in protecting the informants' identities outweighed Jewell's need for the information, we find that the issue is properly before us. The trial court was obligated to apply this balancing test to determine whether Jewell's discovery requests sought irrelevant and unnecessary information or subjected the Atlanta Journal-Constitution to "annoyance, embarrassment, oppression, or undue burden or expense."[13]

The record shows the trial court recognized the parties' compet-

---

[11] *Mead Corp. v. Masterack*, 243 Ga. 213, 215 (253 SE2d 164) (1979).

[12] *Ledee v. Devoe*, 225 Ga. App. 620, 625 (2) (484 SE2d 344) (1997) (physical precedent only).

[13] OCGA § 9-11-26 (c).

ing interests and made an effort to balance these interests. In ruling upon the matter, the trial judge said:

> As expressed in previous Orders, the Court is fully cognizant of the role which confidential sources play in the robust collection and reporting of the news and the vital functions which news-gathering entities perform in [a] free society. To the extent that compelling confidential sources may tend to deter other persons from revealing sensitive information, thereby reducing the information available to the public, that is a regrettable but unavoidable secondary effect of legal investigation; the object of which is also the discovery of the truth.

While it is clear that the trial court attempted to strike some balance between Jewell's need for the information against the Atlanta Journal-Constitution's desire to maintain the confidentiality of its informants, we do not believe the trial court properly considered all of the competing interests.

To properly perform this balancing test in a libel case, the trial court must require the plaintiff to specifically identify each and every purported statement he asserts was libelous, determine whether the plaintiff can prove the statements were untrue, taking into account all the other available evidentiary sources, including the plaintiff's own admissions, and determine whether the statements can be proven false through the use of other evidence, thus eliminating the plaintiff's necessity for the requested discovery. In other words, if Jewell cannot succeed on a specific allegation of libel as a matter of law, or if Jewell is able to prove his specific allegation through the use of available alternative means, then the trial court's balancing test should favor nondisclosure of confidential sources. If, on the other hand, a specific allegation of libel is determined to be legally viable, or if it cannot be determined whether the allegation is legally viable given the current state of the record, and if the identity of the sources either is relevant and material in and of itself or is the only available avenue to other admissible evidence, then the trial court's balancing test should favor disclosure of the confidential sources.

We recognize that, in many respects, the application of this balancing test will involve legal analysis similar to, perhaps even identical to, that required in ruling upon a motion for summary judgment. This will inevitably thwart the trial court's expressed desire to avoid piecemeal adjudication. However, since we cannot ascertain from the record whether the trial court properly applied the balancing test separately to each of Jewell's precise allegations, we vacate the judgments holding the reporters in contempt of court, as well as the

orders requiring disclosure of the reporters' confidential sources, and remand this case to the trial court for the judge to perform the balancing test in accordance with this opinion. We suggest an analytical framework which would require Jewell to precisely identify by date, page, and line each published statement he alleges libels him. The trial court should then look to the entire record to determine if each particular claim is legally viable, and if it is, the trial court can then perform the necessary balancing test as to each legally viable allegation of libel. If, for example, a plaintiff in a libel case alleged that a certain statement was libelous while admitting in another statement that the fact was true, his burden of proving that the statement was false could not possibly be met. His libel action as to that statement would not be legally viable, and there should be no order requiring the defendant to disclose the confidential source of that statement.

## Case No. A01A1565

Jewell moved for partial summary judgment, asserting the trial court should find that he is a private, versus a public, figure. Specifically, the trial court was asked to determine whether, by his public appearances, Jewell became a limited-purpose public figure prior to the Atlanta Journal-Constitution's public disclosure that he was under investigation in connection with the bombing of the Olympic Park. The trial court determined that Jewell is a "voluntary limited purpose public figure" and thereby required him to meet the actual malice standard of proof set forth in *New York Times Co. v. Sullivan*[14] in this defamation action. Jewell appeals this ruling.

In considering this issue, we repeat the basic facts of the case. At the time of the park bombing, Jewell was working as a security guard in the park. Shortly before the explosion, he spotted a suspicious and unattended package and reported its existence to the Georgia Bureau of Investigation. Around the same time, an anonymous 911 call informed police that a bomb had been placed in the park. After he reported the existence of the package, and at a time when police believed the package contained a bomb but did not know when it would explode, Jewell assisted police in moving park patrons away from the package. He also assisted in the evacuation of the five-story tower where the package was located.

Following the explosion of the bomb, but before he became a suspect, Jewell granted one photo shoot and ten interviews. He gave an interview with a reporter from the Boston Globe in which he was quoted regarding the events following his discovery of the package. He gave a live television interview with a CNN reporter which was

---

[14] 376 U. S. 254, 279-280 (84 SC 710, 11 LE2d 686) (1964).

rebroadcast several times, including on The Larry King Show. In this interview, Jewell related the events and praised the professionalism of emergency personnel. He also discussed his six years of law enforcement training and expressed his hope that following the Olympic Games he would be employed by a law enforcement agency in the Atlanta area. Jewell gave another interview with a CNN reporter in which he recounted the events surrounding the bombing. He reportedly said "that he hoped his efforts would help his career in law enforcement." He granted a USA Today interview in which he was extensively questioned regarding the events surrounding the bombing and his personal actions after he found the package. He was quoted as saying that personnel performed their jobs properly and again remarked that he hoped to get a job in the Atlanta area after the Olympics. In the meantime, however, he said he would be back at his post, guarding the Olympic venues. He gave an interview with the Atlanta Journal-Constitution in which he was quoted regarding his efforts and the credit due other law enforcement officers. On another occasion Jewell submitted to a session with a photographer for the Atlanta Journal-Constitution. He appeared on television station WXIA-TV for an interview which was replayed every half-hour from 5:00 a.m. through 7:00 a.m., during which Jewell spoke of the professionalism and heroism of emergency personnel in acting promptly and saving lives. He gave a telephone interview on CNN's Talk Back Live program in which he described the training he and other personnel received in preparation for the Olympic Games and spoke again of his six years in law enforcement in Georgia and of the professionalism of the security, law enforcement, and paramedic personnel. In this interview, Jewell praised the members of the public who continued to attend Olympic events and encouraged them "to show this person or persons that this type of activity would not be tolerated in this world." He was interviewed by anchorwoman Katie Couric on NBC's Today Show, where he spoke of his role in discovering the package, the training provided to security personnel regarding suspicious packages, and the response of security personnel. The real heroes, according to Jewell in this interview, were the emergency personnel who risked themselves to protect the safety of the people remaining in the vicinity of the bomb. Following his appearance on the Today Show, Jewell participated in another interview with an NBC reporter, though this interview was not broadcast. He was also interviewed by an unknown reporter following his appearance on the Today Show.

Four days after the bombing, the Atlanta Journal-Constitution published a front-page article headlined "FBI suspects 'hero' guard may have planted bomb." Subsequently, Jewell alleges, approximately 19 articles portrayed him as an individual who was guilty or

likely guilty of criminal involvement in the bombing, who had a motive for the bombing, and who had an aberrant personality and a bizarre employment history.

3. The central issue presented by this appeal is whether Jewell, as the plaintiff in this defamation action, is a public or private figure, as those terms are used in defamation cases. This is a critically important issue, because in order for a "public figure" to recover in a suit for defamation, there must be proof by clear and convincing evidence of actual malice on the part of the defendant.[15] Plaintiffs who are "private persons" must only prove that the defendant acted with ordinary negligence.[16] Jewell contends the trial court erred in finding that he is a "public figure" for purposes of this defamation action. We disagree.

The definitive case on how a private citizen becomes a public figure for purposes of a defamation action is *Gertz v. Robert Welch, Inc.*, which held:

> Those who, by reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention, are properly classified as public figures. . . . For the most part those who attain this status have assumed roles of special prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. In either event, they invite attention and comment.[17]

The trial court held that Jewell is a voluntary limited-purpose public figure. Jewell argues that he is not because he did not assume a role of special prominence in the controversy over the safety of Olympic Park, he did not voluntarily thrust himself to the forefront of the controversy of the safety of Olympic Park, and he did not intentionally seek to influence the resolution or outcome of any public controversy surrounding the safety of Olympic Park. Jewell further claims that the alleged defamation in this case is not germane to his participation in the controversy over safety at Olympic Park.

In *Silvester v. American Broadcasting Cos.*,[18] the Eleventh Cir-

---

[15] See id.

[16] See *Gertz v. Robert Welch, Inc.*, 418 U. S. 323 (94 SC 2997, 41 LE2d 789) (1974); *Triangle Publications v. Chumley*, 253 Ga. 179, 180-182 (1) (317 SE2d 534) (1984).

[17] *Gertz*, supra at 342, 345.

[18] 839 F2d 1491, 1494 (11th Cir. 1988).

cuit adopted a three-prong test to determine whether a person is a limited-purpose public figure. Under this test, the court must isolate the public controversy, examine the plaintiff's involvement in the controversy, and determine whether the alleged defamation was germane to the plaintiff's participation in the controversy. Whether a person is a public figure, general or limited, is a question of law for the court to resolve.[19]

(a) In isolating the public controversy, the court must look to those controversies that are already the subject of debate in the public arena.[20] The trial court dismissed Jewell's argument that the public controversy was "who bombed the Olympic Park," finding this too narrowly defined the controversy. According to the trial court, the public controversy following the bombing and prior to the alleged defamatory statements included the broader question of the safety of the general public in returning to the Olympic Park area. Safety of the park and other Olympic venues after the bombing involved a real dispute. The outcome of that dispute would affect the general public or some segment of it in an appreciable way, and the ramifications of the dispute would be felt by persons who were not direct participants in the public discussion.[21] Neither party argues on appeal that the trial court erred in reaching this conclusion.

(b) The trial court next examined Jewell's involvement in the controversy. A plaintiff in a libel case must be deemed a public figure if he purposefully tries to influence the outcome of a public controversy or, because of his position in the controversy, could realistically be expected to have an impact on its resolution.[22] A tangential involvement is insufficient.[23] In examining the nature and extent of Jewell's participation in the issue of Olympic Park safety, the court can look to Jewell's past conduct, the extent of press coverage, and the public reaction to his conduct and statements.[24] The court must examine these factors as they existed before the alleged defamation was published.[25] An analysis of these factors shows that Jewell assumed a role of special prominence in the Olympic Park safety debate.

While Jewell asserts that his media role was limited to that of an eyewitness and that he did not attempt to shape the resolution of any controversy, Jewell's participation in interviews and the information he related about the controversy was not so circumscribed. In fact,

---

[19] *Waldbaum v. Fairchild Publications*, 627 F2d 1287, 1293, n. 12 (D.C. Cir. 1980).
[20] Id. at 1297.
[21] Id.; *Silvester*, supra at 1494-1495.
[22] *Silvester*, supra at 1496.
[23] Id.
[24] *Waldbaum*, supra at 1297.
[25] Id. at 1295, n. 19.

the extensive media coverage Jewell received as the individual who discovered the bomb and helped evacuate the public led one federal judge to describe him as a "media hero."[26] The Detroit News headlined its article about the bombing: "Hero: Keen eyesight, level head thrust guard into spotlight."

While we can envision situations in which news coverage alone would be insufficient to convert Jewell from private citizen to public figure, we agree with the trial court that Jewell's actions show that he voluntarily assumed a position of influence in the controversy. Jewell granted ten interviews and one photo shoot in the three days between the bombing and the reopening of the park, mostly to prominent members of the national press. While no magical number of media appearances is required to render a citizen a public figure, Jewell's participation in the public discussion of the bombing exceeds what has been deemed sufficient to render other citizens public figures.[27] Even Jewell commented that the number of interviews he gave — up to two or three within a fifteen-minute period — was so great that he still cannot remember them all. The fact is that Jewell was prominent enough to require the assistance of a media handler to field press inquiries and coordinate his media appearances.

"By publishing your views you invite public criticism and rebuttal; you enter voluntarily into one of the submarkets of ideas and opinions and consent therefore to the rough competition of the marketplace."[28] Jewell stated that he had spotted the bag after a group of rowdy, college-aged men had left the park. And he announced on CNN that he had matched one of the men to a composite sketch. These statements gave the impression that police had solid leads and the park was safe. Jewell also repeatedly offered assurances that his training had been sufficient to handle the situation, that other law enforcement personnel had received adequate training to handle the situation, and that law enforcement personnel did all they could in response to the situation. In addition, Jewell spoke with a television crew conducting interviews on whether the Olympic Games should continue and whether the park should reopen. He offered encouragement to members of the public who had continued coming to the Olympic Games.

Jewell should have known, and likely did know, that his comments would be broadcast and published to millions of American citizens searching for answers in the aftermath of the bombing. Clearly,

---

[26] *In re Four Search Warrants*, 945 FSupp. 1563, 1564 (N.D. Ga. 1996).

[27] See *Finkelstein v. Albany Herald Publishing Co.*, 195 Ga. App. 95, 97 (1) (392 SE2d 559) (1990) (one appearance on a local television program and quotes in one newspaper article criticizing district attorney sufficient to make plaintiff a limited-public figure).

[28] *Dilworth v. Dudley*, 75 F3d 307, 309 (7th Cir. 1996).

his repeated comments regarding the adequacy of the law enforcement preparation, the appropriateness of the response to the bombing, and the safety of those returning to the park could realistically be expected to have an impact on the controversy's resolution.

Jewell claims he gave the interviews only to accommodate the desires of his employer and that he never intended to have any influence on the matters. Whether a person has voluntarily injected himself into a public controversy in order to have an impact on its outcome cannot be determined solely by reference to the actor's subjective motives. The court must ask whether a reasonable person would have concluded that Jewell would play or was seeking to play a major role in determining the outcome of the controversy.[29] Viewed objectively, Jewell's numerous media appearances in the days following the bombing reveal that he attempted to improve the public's perception of security at the park. The media spokesman who facilitated many of the interviews told Jewell he was under no obligation to do any interviews, but Jewell nevertheless voluntarily made media appearances. This evidence was sufficient to support the trial court's determination that Jewell was a voluntary limited-purpose public figure.

Furthermore, the United States Supreme Court has held the actual malice rule is applicable whenever "an individual voluntarily injects himself *or is drawn into* a particular public controversy."[30] The evidence in this case, at the very least, supports a finding that Jewell was initially drawn into the controversy unwillingly and thereafter assumed a prominent position as to its outcome.[31] Jewell did not reject any role in the public controversy debate, was a prominent figure in the coverage of the controversy, and, whatever his reticence regarding his media appearances, encountered them voluntarily. "[I]t is no answer to the assertion that one is a public figure to say, truthfully, that one doesn't choose to be. It is sufficient . . . that [Jewell] voluntarily engaged in a course that was bound to invite attention and comment."[32] The trial court did not err in finding that Jewell met the second prong of the *Silvester* test.

(c) The third prong of the *Silvester* test requires the court to ascertain whether the allegedly defamatory statements were germane to Jewell's participation in the controversy.[33] Anything which might touch on the controversy is relevant.[34] Misstatements wholly

---

[29] *Waldbaum*, supra at 1298.
[30] (Emphasis supplied.) *Gertz*, supra at 351.
[31] See *Silvester*, supra at 1496.
[32] (Citation and punctuation omitted.) Id.
[33] Id. at 1497.
[34] See *Waldbaum*, supra.

unrelated to the controversy do not require a showing of actual malice to be actionable.[35]

As recognized in *Waldbaum*, a publication is germane to a plaintiff's participation in a controversy if it might help the public decide how much credence should be given to the plaintiff.[36] Here, Jewell was on the scene in his role as a security guard, he found the bomb and reported its existence to authorities, and he helped evacuate people from the scene. During interviews, he discussed his participation in the events, his previous training, the training and reactions of other law enforcement personnel on the scene, and urged the public to show the bomber that this type of activity would not be tolerated.

Certainly, the information reported regarding Jewell's character was germane to Jewell's participation in the controversy over the Olympic Park's safety. A public figure's talents, education, experience, and motives are relevant to the public's decision to listen to him.[37] The articles and the challenged statements within them dealt with Jewell's status as a suspect in the bombing and his law enforcement background.

4. Even if the trial court erred in finding that Jewell was a voluntary limited-purpose public figure, the record contains clear and convincing evidence that, at the very least, Jewell was an involuntary limited-purpose public figure. While, in general, a public figure voluntarily puts himself into a position to influence the outcome of the controversy, "[o]ccasionally, someone is caught up in the controversy involuntarily and, against his will, assumes a prominent position in its outcome. Unless he rejects any role in the debate, he too has 'invited comment' relating to the issue at hand."[38] The decision in *Dameron v. Washington Magazine*[39] provides an excellent example of the types of circumstances in which an individual can become an involuntary public figure.

In *Dameron*, the plaintiff claimed defamation in connection with a magazine article that mentioned his role as the sole air traffic controller on duty at the time of a notorious airliner crash. Although the plaintiff had not availed himself of the media to speak on the public issues relating to the crash, he was nonetheless held to be an involuntary public figure.[40] The plaintiff's sole role in the controversy over the cause of the crash was that he was the air traffic controller on duty at the time of the crash and he subsequently testified at a

---

[35] Id.
[36] Id.
[37] Id.
[38] Id.; *Silvester*, supra at 1496.
[39] 779 F2d 736, 741-742 (D.C. Cir. 1985).
[40] Id. at 740-743.

National Transportation Safety Board hearing on the crash.

The same considerations that led the *Dameron* court to find the plaintiff in that case was an involuntary public figure require the same conclusion in this case. Even if we found that Jewell did not "inject" himself into the controversy, "[i]njection is not the only means by which public-figure status is achieved. Persons can become involved in public controversies and affairs without their consent or will."[41] Jewell, who had the misfortune to have a tragedy occur on his watch, is such a person.

Like the plaintiff in *Dameron*, Jewell was an ordinary citizen who was unknown to the public before the Olympic Park bombing, never sought to capitalize on the fame he achieved through his actions in events surrounding the bombing, and never acquired any notoriety apart from the bombing and the investigation which followed. However, there is no question that Jewell played a central, albeit possibly involuntary, role in the controversy over Olympic Park safety. Jewell happened to be the security guard on duty at the time of the bombing, happened to be the security guard who found the bomb, and happened to be involved in the evacuation of the public from the area where the bomb was located. He became embroiled in the ensuing discussion and controversy over park safety and became well known to the public in this one very limited connection. Whether he liked it or not, Jewell became a central figure in the specific public controversy with respect to which he was allegedly defamed: the controversy over park safety.

### Case No. A01A1566

5. In this appeal, the Atlanta Journal-Constitution seeks review of the trial court's refusal to grant its motion for judgment on the pleadings and its motion for summary judgment. The record shows that the Atlanta Journal-Constitution's motion for judgment on the pleadings was filed on March 27, 1997, but was withdrawn on August 21, 1998. Because it had been withdrawn, the trial court never ruled upon the merits of that motion, and there is no ruling for us to review. The withdrawal of the motion renders the matter moot, and mootness is a mandatory ground for dismissal of an appeal.[42]

The Atlanta Journal-Constitution's motion for summary judgment was filed on December 22, 1998. On March 16, 1999, based on the newspaper's refusal to obey the trial court's discovery orders, the trial court issued an order in which it ruled that a decision on the Atlanta Journal-Constitution's motion for summary judgment would

---

[41] Id. at 741.
[42] OCGA § 5-6-48 (b) (3).

be deferred until discovery, including the newspaper's compliance with Jewell's discovery requests, was completed.

At the time this appeal was filed, the discovery issues raised in Case No. A01A1564 had not been resolved. Consequently, the trial court had not scheduled a hearing on the Atlanta Journal-Constitution's motion for summary judgment.

6. Jewell has filed a motion to dismiss this appeal on the basis that this Court lacks jurisdiction to consider the appeal because there is no ruling by the trial court for us to review. As this Court recently explained in *Waters v. Glynn County*[43]: "Where a trial court does not rule on an issue, it remains outside the jurisdiction of this Court and we cannot consider it." This is particularly true when the record below shows that a trial court has not ruled on a motion for summary judgment.[44]

We have noted that the Atlanta Journal-Constitution's motion for judgment on the pleadings was rendered moot when it was withdrawn on August 21, 1998. Regarding the trial court's refusal to grant the Atlanta Journal-Constitution's motion for summary judgment, it is clear that any arguments in this regard are not ripe for review by this Court. Enumerations of error relating to a motion for summary judgment which have not yet been ruled upon are not ripe for appellate review because there has been no ruling below, and this Court may not address these issues in the first instance.[45]

7. Even if we construe the Atlanta Journal-Constitution's enumerations of error as appealing the trial court's order deferring a ruling on the Atlanta Journal-Constitution's motion for summary judgment, the argument fails. It was within the trial court's discretion to defer a ruling in this case, especially in light of the Atlanta Journal-Constitution's continued refusal to comply with the trial court's orders concerning discovery. The Atlanta Journal-Constitution's refusal to comply with the trial court's orders compelling discovery directly resulted in the trial court's refusal to rule on the motion for summary judgment. On appeal, one cannot complain of a judgment, order, or ruling that his own procedure or conduct aided in causing.[46]

Moreover, it is beyond dispute that our decision as to the issues

---

[43] 237 Ga. App. 438, 441 (4) (514 SE2d 680) (1999).

[44] See *Hardin v. Leitch*, 232 Ga. App. 432, 433 (2) (502 SE2d 288) (1998) (a motion for summary judgment that has not been ruled upon is not ripe for review).

[45] Id. See also *Paulsen Street Investors v. EBCO Gen. Agencies*, 224 Ga. App. 507, 508 (481 SE2d 246) (1997) (where issues are not ruled upon by the trial court, they are outside the jurisdiction of this Court); *Sharpnack v. Hoffinger Indus.*, 223 Ga. App. 833, 836 (3) (479 SE2d 435) (1996) (trial court's failure to grant or deny motion for summary judgment leaves this Court with no jurisdiction to consider the issues raised by the motion).

[46] *Studdard v. Satcher, Chick, Kapfer, Inc.*, 217 Ga. App. 1, 3 (456 SE2d 71) (1995).

in Case Nos. A01A1564 and A01A1565 will have a direct and significant impact on the trial court's ruling on the motion for summary judgment. Until it was determined with finality whether Jewell is to be considered a private or public citizen, the standard of proof necessary for Jewell to maintain his claim was unsettled. It has only now been finally determined that as a public figure, Jewell must show by clear and convincing evidence that false and defamatory statements were published with actual malice.[47] Had we determined that Jewell acted as a private citizen, he would have been required only to show by a preponderance of the evidence that false and defamatory statements were negligently published.[48] Thus, before the trial court could properly rule on the Atlanta Journal-Constitution's motion for summary judgment, it had to know with finality whether Jewell is a private citizen or a public figure plaintiff,[49] something the trial court could not know until the decision in these appeals was rendered. Since discovery in this case was ongoing, the trial court did not err in refusing to rule on the Atlanta Journal-Constitution's motion for summary judgment.

For these reasons, Jewell's motion to dismiss this appeal is hereby granted.

*Judgment vacated and case remanded with directions in Case No. A01A1564. Judgment affirmed in Case No. A01A1565. Appeal dismissed in Case No. A01A1566. Ruffin and Ellington, JJ., concur.*

DECIDED OCTOBER 10, 2001 — 

*Dow, Lohnes & Albertson, Peter C. Canfield, Sean R. Smith, Thomas M. Clyde, James A. Demetry,* for appellants.

*L. Lin Wood, Jr., G. Watson Bryant, Jr., David B. Hornsby, Mahaley C. Paulk,* for appellee.

*Hull, Towill, Norman, Barrett & Salley, David E. Hudson,* amicus curiae.

---

[47] *St. Amant v. Thompson,* 390 U. S. 727, 731 (88 SC 1323, 20 LE2d 262) (1968).
[48] *Triangle Publications,* supra at 180.
[49] See generally *Barber v. Perdue,* 194 Ga. App. 287 (390 SE2d 234) (1989).