## A02A2190. SPARKS v. PEASTER.
### (581 SE2d 579)

SMITH, Chief Judge.

Craig Sparks, a resident of the City of Montezuma, brought this action for defamation and tortious interference with employment against the city manager, David Peaster. After discovery, the trial court carefully analyzed Sparks's claims and entered a lengthy, meticulous, and thoughtful order granting summary judgment in favor of Peaster. We agree with the trial court that Sparks, a local political activist, is a limited purpose public figure by reason of his extensive participation in city affairs and that Sparks failed to show that Peaster acted with actual malice.[1] We therefore affirm.

The facts of this case were largely developed from pleadings and discovery in a federal district court action brought by Sparks under 42 USC § 1983. The district court granted summary judgment against Sparks on his federal claims and declined to exercise pendent jurisdiction over the remaining state claims. Sparks promptly filed this action in Macon County Superior Court asserting his state law claims for defamation and tortious interference with employment. The superior court adopted and incorporated the discovery and pleadings from the federal action.

The record shows that this litigation arose out of persistent difficulties between Sparks and city government officials. The controversy ultimately widened to involve the mayor and city council, the police chief and assistant chief, employees of the city clerk's office, and a local newspaper as well as Peaster. The two matters of which Sparks complains here are a conversation between Peaster and the interim editor of the newspaper and a letter Peaster wrote to Sparks's employer, Weyerhauser. According to the editor, Peaster told her that Sparks has a "serious cocaine habit" and that "his brains are just fried with drugs."[2] The letter was in reference to a city recognition of Weyerhauser for its charitable contributions to Macon

---

[1] Sparks's motion to withdraw his tortious interference with contract claim on the basis of *Culpepper v. Thompson*, 254 Ga. App. 569, 571 (b) (562 SE2d 837) (2002), is granted.

[2] Peaster denies having made the statements as alleged, but on summary judgment all disputed issues of fact are construed against the movant. *Fuller v. Jennings*, 213 Ga. App. 773 (445 SE2d 796) (1994).

County. Peaster apologized to the community relations manager for Weyerhauser that the ceremony did not receive much recognition in a local newspaper, because it was "upstaged by 'Robert's Rules of Order' and coverage of a citizen who gives nothing back to the community but has a reputation as a problem maker and not a problem solver."

Sparks is a community activist in Montezuma. He regularly appears at city council meetings and speaks on a variety of issues, including senior citizens' issues, children's recreation, water and sewer bills, salary increases, street and land maintenance, flood relief, and other issues. He acknowledged in his deposition that numerous people approached him, for example, to obtain help with their water bills and that he made inquiries at city hall on their behalf. He also printed and distributed flyers to the community regarding community issues and on one occasion inquired about a permit for a march.

A local newspaper featured Sparks as the recipient of a "Political Activist Salute," describing him as a "local political watchdog" and recognizing him for "keeping watch over local government activities and for speaking up for those who turn to him for help." Sparks was quoted in the article as wanting to

> send a message to government officials, either verbally or by physically attending the meetings, that the taxpayers are concerned about what's going on, how our money is being spent, fairness in government activities, and so forth. . . . I know I make people at city hall mad, but I don't care. They need to be reminded who they work for. They work for all of us — the taxpayers, the citizens of this community.

In his deposition, Sparks agreed that the article was an accurate characterization of his activities. He was also a regular but unofficial contributor to the same newspaper. According to the interim editor, she had a regular Friday morning meeting with Sparks, at which he informed her of issues and concerns of the community. She also testified that she "steered" Sparks toward investigating certain issues, such as the allocation of flood relief money.[3]

---

[3] This newspaper and its interim editor, who testified on behalf of Sparks regarding Peaster's alleged statements, had a history of conflict with city officials, particularly Peaster. The editor testified that the newspaper had published articles "casting a definite shadow on city government" and attacking the city's handling of various official matters. This eventually spilled over into an acrimonious exchange in the pages of the paper between the interim editor and Peaster. Peaster testified that he believed the paper's hostility was due to its failure to get the city's business from the other newspaper in Montezuma. The interim editor testified that the paper was sold shortly before she left her position and that the new owners

Witnesses testified that Sparks was extremely aggressive in his pursuit of community affairs and on occasion appeared irrational. According to the police chief, in 1993 the city clerk, Ms. Hardy, complained to him that Sparks "was under the influence of alcoholic beverage at the City Hall and got in some sort of confrontation with" her. The police chief testified that employees at the city clerk's office were fearful of Sparks because of his loud, demanding, and irrational behavior toward them, which they believed rose "to the point of harassment of them personally." Peaster told the police chief that he was in fear of bodily harm from Sparks. The police chief witnessed several encounters between Sparks and the city clerk and opined that "those conversations have been very heated and that Ms. Hardy is expressing genuine fear." He described Sparks's visits to city hall and to council meetings as "confrontational." On one occasion during a public meeting Sparks "yelled at the council that they were crooks." Sparks acknowledged calling them "a bunch of crooks" and calling the mayor a liar. Asked if he had acted irrationally in conversations with city employees, Sparks denied that he acted irrationally on "initial appearance" but that he became frustrated when he was unable to get the information he wanted. He denied having threatened the clerk.

The police chief also testified that he had received information from two or three telephone callers that Sparks was using cocaine. Peaster had expressed concern to the chief that

> sometimes when Mr. Sparks appears before the mayor and council and is up here that he may be high on something and that they are in fear of their lives. That is a genuine fear I think that Mr. Peaster has. And I do know that at one city council meeting we did have the drug task force in the room just because we were fearful that there might be some outburst or, you know, violence take place in the council chambers at a public meeting.

The assistant police chief described an incident in which he was sitting in the break room when "the city clerk just burst through the door and started hollering for Mr. Peaster. . . . She said something to the effect, you better do something with Craig Sparks, he's coming in here." The assistant chief looked for Sparks but could not find him. He also testified concerning an incident in which he "had a struggle" with Sparks and had to call for backup. Sparks's parents had summoned an ambulance to the house to carry him to the hospital, but he

---

of the paper "wanted to keep a lower profile" with the city and "distanced themselves from Craig [Sparks]."

did not want to go. The EMTs were unable to control him and called police. When the assistant chief arrived, Sparks "was hollering and running through the house." The assistant chief was unable to restrain him as Sparks was "slinging [him] around," and he called for additional officers who eventually were able to control Sparks. Sparks's mother told the assistant chief that Sparks "had taken something," and he appeared to be under the influence of some type of drug. Sparks testified that he was ill but felt better after the EMTs gave him a shot, that he did not want to go to the hospital, and that he "can't remember" resisting or struggling with the officers.

Peaster testified that he became concerned about Sparks because his employees felt threatened by Sparks's conduct in the city clerk's office. As a result, he inquired of the police department and was told by the chief and the assistant chief that Sparks had a drug problem. They also told Peaster about the incident at Sparks's house.

1. We first address the issue of whether the trial court correctly held that Sparks was a limited purpose public figure. The leading case on determining an individual's status as a "public figure" is *Gertz v. Robert Welch, Inc.*, 418 U. S. 323 (94 SC 2997, 41 LE2d 789) (1974). There, the United States Supreme Court noted:

> For the most part those who attain this status have assumed roles of special prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. In either event, they invite attention and comment.

Id. at 345. We recently addressed this area of law in *Atlanta Journal-Constitution v. Jewell*, 251 Ga. App. 808 (555 SE2d 175) (2001). In *Jewell*, we adopted the three-prong test enunciated in *Silvester v. American Broadcasting Cos.*, 839 F2d 1491, 1494 (11th Cir. 1988), to determine whether a person is a limited purpose public figure: the court "isolate[s] the public controversy, examine[s] the plaintiff's involvement in the controversy, and determine[s] whether the alleged defamation was germane to the plaintiff's participation in the controversy." *Jewell*, supra at 816-817 (3). This is a question of law for the court to resolve. Id. at 817 (3). The Supreme Court of Georgia adopted this analysis in *Mathis v. Cannon*, 276 Ga. 16 (573 SE2d 376) (2002).[4]

---

[4] *Mathis* involved allegations that a private citizen defamed the owner of a local business via messages posted on an Internet "message board." Sparks's contention that the *Jewell* analysis is limited to "newspaper cases" is therefore without merit.

Sparks denies that he is a public figure for any purpose, contending that he was merely a citizen who spoke out occasionally on matters concerning himself only and did not otherwise inject himself into public business. He contends he did not acquire any "special prominence" or engage in any "public activity." But Sparks voluntarily became involved in numerous issues of public controversy with the stated intent of influencing their outcome, and an analysis of his activities under the *Jewell* test supports the trial court's conclusion that Sparks is a limited purpose public figure.

(a) While Sparks contends that Peaster has "failed to identify any public question in which plaintiff acquired 'special prominence,'" it is apparent that the public controversy at issue here is the administration of the City of Montezuma, particularly the allocation of municipal funds. The local government issues surrounding this controversy were "already the subject of debate in the public arena," (footnote omitted) *Jewell*, supra at 817 (3) (a), and "resolution of the controversy will affect people who do not directly participate in it." *Silvester*, supra at 1494-1495. "[I]t is not the global nature of the public's interest that defines a dispute as a public controversy, but rather whether the issue generates discussion, debate, and dissent in the relevant community." *Mathis*, supra at 24 (3). Administration of the local government entity therefore constitutes the "public controversy" at issue here.

(b) We next examine the extent to which Sparks involved himself in the controversy. "A plaintiff in a libel case must be deemed a public figure if he purposefully tries to influence the outcome of a public controversy or, because of his position in the controversy, could realistically be expected to have an impact on its resolution." (Footnote omitted.) *Jewell*, supra at 817 (3) (b). "One who voluntarily thrusts himself to the forefront of a public controversy in order to influence the resolution of the issues involved is deemed to be a public figure with respect to the controversy." *Finkelstein v. Albany Herald Publishing Co.*, 195 Ga. App. 95, 97 (1) (392 SE2d 559) (1990). *Finkelstein* required minimal participation in a public controversy for the appellant to become a limited purpose public figure: he made one appearance on a local television program and was quoted in one newspaper article. In *Mathis v. Cannon*, supra, the Supreme Court did not rely upon any media exposure but held that the plaintiff voluntarily injected himself into the controversy over a local government authority by facilitating his own business with the authority. Id. at 22 (3).

In this case, Sparks was the subject of a feature story in a local newspaper and is quoted in the story acknowledging his political actions on behalf of others and his intention to influence government officials. The story describes Sparks's participation in civic affairs as a "local political watchdog," particularly his role in gathering infor-

mation on and publicizing others' concerns. In addition, his distribution of flyers, his inquiries about a permit for a march, and his service as a regular consultant or informant for a newspaper which was "steered" by the editor to promote or publicize certain issues go well beyond Sparks's characterization of himself as merely a concerned citizen availing himself of the right to attend and speak at city council meetings. Particularly in the "relevant community," *Mathis*, supra at 24 (3), a small town with a population of approximately 4,000, Sparks's outspoken participation in this controversy not only was a purposeful attempt to influence the outcome but also "could realistically be expected to have an impact on its resolution." (Footnote omitted.) *Jewell*, supra at 817 (3) (b). Clearly, Sparks intended to "enter voluntarily into one of the submarkets of ideas and opinions and consent therefore to the rough competition of the marketplace." (Punctuation and footnote omitted.) Id. at 818.

(c) Finally, Sparks's credibility and motivations for his behavior are relevant to the issues on which he engaged the city, as Sparks himself acknowledges. "[A] publication is germane to a plaintiff's participation in a controversy if it might help the public decide how much credence should be given to the plaintiff." (Footnote omitted.) *Jewell*, supra at 820 (3) (c). Information regarding Sparks's character and stability is relevant to the amount of trust that the public may place in his statements and assertions. Sparks therefore is a limited purpose public figure.

2. Sparks contends that Peaster remains liable, even if Sparks is determined to be a public figure, because he acted with actual malice. Sparks claims that Peaster "intentionally made defamatory comments about Plaintiff being on drugs when Defendant had absolutely no knowledge of this as a fact." He contends that Peaster "made this story up in order to discredit Plaintiff's character and credibility" so that Sparks would no longer have access to the newspaper and he would be discredited as a source.

The standard of proof of "actual malice" with regard to a public figure is high. As described in *Jewell*, supra, Sparks has the burden to "show by clear and convincing evidence that false and defamatory statements were published with actual malice." (Footnote omitted.) Id. at 823 (7). "Actual malice" in a constitutional sense is not mere spite or ill will; it must be actual knowledge that a statement is false or reckless disregard as to its truth or falsity. *Williams v. Trust Co.*, 140 Ga. App. 49, 56 (III) (230 SE2d 45) (1976).

> Actual or constitutional malice is different from common law malice because knowledge of falsity or reckless disregard of the truth may not be presumed nor derived solely from the language of the publication itself. Reckless disregard

requires clear and convincing proof that a defendant was aware of the likelihood he was circulating false information. Thus, it is not sufficient to measure reckless disregard by what a reasonably prudent man would have done under similar circumstances nor whether a reasonably prudent man would have conducted further investigation. The evidence must show in a clear and convincing manner that a defendant in fact entertained serious doubts as to the truth of his statements.

(Citations and punctuation omitted.) *Davis v. Shavers*, 225 Ga. App. 497, 500-501 (3) (484 SE2d 243) (1997), aff'd, 269 Ga. 75 (495 SE2d 23) (1998).

The record contains evidence not only from Peaster but from other city officials that Sparks's conduct in his dealings with city government was confrontational and at times appeared irrational and dangerous. Peaster testified that his personal observations of Sparks's behavior in council meetings and at city hall led him to make inquiries of the police department in the interest of his employees' safety. The reports he received from police officials gave him reason to believe that Sparks had a problem with drugs. Police officials confirmed these reports and that they had discussed them with Peaster. Under these circumstances, Sparks has failed to meet his heavy burden to show actual knowledge or reckless disregard of truth or falsity, and the trial court correctly concluded that summary judgment was appropriate on Sparks's defamation claim.

*Judgment affirmed. Eldridge and Ellington, JJ., concur.*

DECIDED MARCH 13, 2003.

*Edwards & Youmas, Lonzy F. Edwards*, for appellant.
*Chambless, Higdon & Carson, John J. Makowski*, for appellee.