A05A2077. SEWELL v. TRIB PUBLICATIONS, INC. et al.
(622 SE2d 919)

PHIPPS, Judge.

Said Sewell is an assistant university professor. A student enrolled in one of his courses took umbrage at certain classroom statements by Sewell concerning America's military involvement in Iraq. The student thereupon contacted a newspaper reporter. As a result, it was reported in two newspaper articles that the student had walked out of Sewell's class, because Sewell had made certain anti-American statements in his classroom while refusing to allow any contrary views to be expressed.

Sewell brought this action against the newspapers, the reporter, and others, seeking damages based on claims of libel, slander, invasion of privacy by publicly placing him in a false light, and intentional

infliction of emotional distress. Sewell denies having made the statements attributed to him. He charges the defendants with negligence in failing to verify the accuracy of the contents of the articles. Defendants moved for summary judgment, arguing that Sewell is a limited-purpose public figure under Georgia defamation law and, as such, is required to show actual malice to recover. Agreeing with this argument, and finding no evidence of actual malice, the trial court awarded summary judgment to the defendants. Sewell appeals. We affirm as to Sewell's claims for invasion of privacy and intentional infliction of emotional distress but reverse as to his defamation claims.

To prevail at summary judgment, the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the nonmovant's favor, warrant judgment as a matter of law. A defendant who will not bear the burden of proof at trial need only show an absence of evidence to support an essential element of the nonmoving party's case. If the moving party discharges this burden, the nonmoving party cannot rest on its pleadings, but rather must point to specific evidence giving rise to a triable issue.[1]

The following facts are undisputed. Sewell is an assistant professor in the political science department at the State University of West Georgia. In April 2003, Andrew Billingsley was enrolled in a political science course on American government taught by Sewell. Cindy Morley is a reporter for the Fayette Daily News (FDN) and Today in Peachtree City (TPC), two news publications in Fayette County. On or about April 1, Billingsley contacted Morley with complaints about classroom statements by Sewell concerning the Bush administration's conduct of the war in Iraq and Sewell's refusal to let Billingsley express contrary opinions.

As a result, the FDN published an article on April 3 written by Morley and headlined, " 'American troops murdered people . . .' Fayette student at West Georgia walks out of class after political science professor Said Sewell makes anti-American statements." The article quoted Billingsley as saying that Sewell had deviated from his stated lesson plan by discussing the war in Iraq, had accused American troops of murdering people, and had likened President Bush to a fascist. The article reported that when Billingsley raised his hand to

---

[1] *Latson v. Boaz*, 278 Ga. 113, 113-114 (598 SE2d 485) (2004) (citations and punctuation omitted).

object, Sewell suggested that he leave the class, which he did, and that Billingsley was demanding an apology from Sewell. On April 10, Morley wrote another article published in the TPC, summarizing the contents of the earlier article and quoting Billingsley as having said that Sewell had recanted his position on American troops and had acknowledged the importance of students speaking out in class. The April 10 article concluded by noting that Sewell had chosen not to comment on the matter when contacted by telephone the week before.

1. The superior court erred in awarding summary judgment to the defendants on Sewell's defamation claims based on its determination that he is a limited-purpose public figure who must show malice before recovering damages.

In *New York Times Co. v. Sullivan*,[2] the United States Supreme Court "defined a constitutional privilege intended to free criticism of public officials from the restraints imposed by the common law of defamation."[3] *New York Times* established a federal rule " 'that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with "actual malice" — that is, with knowledge that it was false or with reckless disregard of whether it was false or not.' "[4]

A majority of the Court in *Curtis Publishing Co. v. Butts*[5] and *Associated Press v. Walker*[6] later extended the constitutional privilege of *New York Times* to defamatory criticism of "public figures." A plurality of the Court in *Rosenbloom v. Metromedia*[7] concluded that " 'all discussion and communication involving matters of public or general concern,' [cit.], warrant the protection from liability for defamation accorded by the rule originally enunciated in *New York Times Co. v. Sullivan. . . .*"[8]

But in *Gertz v. Robert Welch, Inc.*,[9] a majority of the Court disapproved the *Rosenbloom* plurality approach and reaffirmed that "[t]he *New York Times* standard defines the level of constitutional protection appropriate to the context of defamation of a public person."[10] The *Gertz* majority reasoned that

---

[2] 376 U. S. 254 (84 SC 710, 11 LE2d 686) (1964).

[3] *Gertz v. Robert Welch, Inc.*, 418 U. S. 323, 334 (94 SC 2997, 41 LE2d 789) (1974).

[4] Id., citing *New York Times*.

[5] 388 U. S. 130 (87 SC 1975, 18 LE2d 1094) (1967).

[6] 388 U. S. 140 (87 SC 1975, 18 LE2d 1094) (1967).

[7] 403 U. S. 29 (91 SC 1811, 29 LE2d 296) (1971).

[8] *Gertz*, supra (citing *Rosenbloom*).

[9] Supra.

[10] Id., 418 U. S. at 342.

[p]ublic officials and public figures usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy. Private individuals are therefore more vulnerable to injury, and the state interest in protecting them is correspondingly greater.[11]

Moreover, the *Gertz* majority found it important that "[a]n individual who decides to seek governmental office must accept certain necessary consequences of that involvement in public affairs. He runs the risk of closer public scrutiny than might otherwise be the case."[12] *Gertz* further concluded that "[t]hose classed as public figures stand in a similar position."[13] *Gertz* recognized, however, that

[h]ypothetically, it may be possible for someone to become a public figure through no purposeful action of his own, but the instances of truly involuntary public figures must be exceedingly rare. For the most part those who attain this status have assumed roles of special prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. In either event, they invite attention and comment.[14]

*Gertz* thus recognized two general types of public figures, all-purpose public figures and limited-purpose public figures.[15] *Gertz* further recognized that a limited-purpose public figure may become so either voluntarily or involuntarily.[16]

The defamation plaintiffs in *Silvester v. American Broadcasting Cos.*[17] were gambling operators whom the Eleventh Circuit classified as voluntary limited-purpose public figures, because there was a legitimate public controversy involving corruption in their industry; plaintiffs were prominent members of the industry and the primary

---

[11] Id. at 344 (footnote omitted).

[12] Id.

[13] Id. at 345.

[14] Id.

[15] See *Atlanta Journal-Constitution v. Jewell*, 251 Ga. App. 808, 816-821 (3), (4) (555 SE2d 175) (2001); *Silvester v. American Broadcasting Cos.*, 839 F2d 1491, 1494-1495 (11th Cir. 1988).

[16] See *Jewell*, supra.

[17] Supra.

or sole focus of certain aspects of the controversy; and one of the plaintiffs thrust himself to the forefront of the controversy in an attempt to influence its outcome, by appearing before a state gaming commission during its investigation of the corruption and by making statements to the press.

In *Atlanta Journal-Constitution v. Jewell*,[18] this court found Richard Jewell to be both a voluntary and involuntary limited-purpose public figure in regard to the 1996 Centennial Olympic Park bombing, because he voluntarily participated in the publicity surrounding the bombing, allowed himself to be photographed by the press, granted press interviews, and occupied a central, albeit involuntary, role in the controversy.

In *Mathis v. Cannon*,[19] a majority of our Supreme Court concluded that a Crisp County resident had become a limited-purpose public figure with respect to a controversy concerning the operation of a solid waste recovery facility in the county, primarily because he had been a crucial actor in the events giving rise to the controversy. The majority recognized that, "it is not the global nature of the public's interest that defines a dispute as a public controversy, but rather whether the issue generates discussion, debate, and dissent in the relevant community. . . ."[20]

In *Silvester*,[21]

> the Eleventh Circuit adopted a three-prong test to determine whether a person is a limited-purpose public figure. Under this test, the court must isolate the public controversy, examine the plaintiff's involvement in the controversy, and determine whether the alleged defamation was germane to the plaintiff's participation in the controversy. Whether a person is a public figure, general or limited, is a question of law for the court to resolve.[22]

We applied *Silvester*'s three-prong test in *Jewell*, as did our Supreme Court in *Mathis*.

Applying the *Silvester* test, the superior court classified Sewell as a limited-purpose public figure, determining that a controversy existed in his classroom regarding American military activities in Iraq, that Sewell initiated the controversy, and that the newspaper articles that formed the basis for his complaint dealt with the

---

[18] Supra.

[19] 276 Ga. 16, 21-25 (3) (573 SE2d 376) (2002).

[20] Id. at 24.

[21] Supra.

[22] *Jewell*, supra at 816-817 (3) (footnote omitted).

controversy. We find the superior court's legal analysis flawed. The public controversy, indeed, concerned American military activities in Iraq. But, by discussing the controversy in his classroom, Sewell in no way thrust himself to the forefront of the controversy in any public forum, so as to have gained access to media outlets generally unavailable to private citizens or to have assumed any risks incident to acceptance of a public role in the matter. Indisputably, he made no comments to the media, as was done by defamation plaintiffs in *Jewell* and *Silvester*. He did not appear on television, as did the plaintiffs in *Jewell* and *Finkelstein v. Albany Herald Publishing Co.*[23] And he certainly was not an actor in the events giving rise to the public controversy, as were plaintiffs in *Mathis, Jewell,* and *Silvester*. The controversy here, concerning the Iraq war, was of a global nature. Arguably, however, the "relevant community" was Fayette County, where the newspaper articles were published. But prior to publication of the articles, Sewell was in no way a public figure with respect to the controversy either in that community or in the global community. The superior court, therefore, erred in awarding summary judgment to the defendants on Sewell's defamation claims on grounds that he attained the status of a limited-purpose public figure who must show malice to recover damages. Because he is a private figure, a negligence standard applies to Sewell's defamation claims.[24] The defendants do not claim there is no evidence of negligence.

2. The superior court's award of summary judgment to the defendants on Sewell's claims for invasion of privacy and intentional infliction of emotional distress was not, however, error.

Although the majority in *Gertz* disapproved the broad view taken by the *Rosenbloom* plurality, *Time, Inc. v. Hill*[25] continues to extend the rule of *New York Times* to an action for invasion of privacy under state law based on false reports of matters of public interest.[26] Thus, to recover for invasion of privacy, Sewell must show that the defendants acted with actual malice, i.e., with knowledge that the allegedly defamatory utterances were false or with reckless disregard as to whether they were true.

> Reckless disregard requires clear and convincing proof that a defendant was aware of the likelihood he was circulating false information. Thus, it is not sufficient to measure reckless disregard by what a reasonably prudent man would

---

[23] 195 Ga. App. 95, 97 (1) (392 SE2d 559) (1990).

[24] *Mathis*, supra at 21 (2).

[25] 385 U. S. 374 (87 SC 534, 17 LE2d 456) (1967).

[26] *Walt Disney Productions v. Shannon*, 247 Ga. 402, 403 (1) (276 SE2d 580) (1981).

have done under similar circumstances nor whether a reasonably prudent man would have conducted further investigation. The evidence must show in a clear and convincing manner that a defendant in fact entertained serious doubts as to the truth of his statements.[27]

The superior court correctly ruled there is no evidence upon which a jury could base a finding of actual malice by the defendants in publishing the articles. The two individual defendants in this case are Cindy Morley, the reporter who wrote the articles, and Chuck Morley, the editor of the newspapers. Indisputably, neither was personally acquainted with Sewell. Cindy Morley testified that before publishing the first article, she had tried without success to contact Sewell; that she had not attempted to contact any other students because she did not know any; and that she had not asked Billingsley for the names of any other students because, in her view, Billingsley was the focus of the article. Chuck Morley testified that he had found Billingsley to be credible based on his involvement in civic affairs as well as his family's long-standing reputation in the community, and that he had found no reason to believe that the statements made by Billingsley were false. Although counsel for Sewell elicited an acknowledgment from Billingsley that in some respects the articles may have been misleading, a review of other parts of Billingsley's testimony shows that in all material respects the articles accurately related what he had said. And although Billingsley testified that his family was not active in the community and had not lived there for long, that in itself does not clearly show that the defendants in fact entertained serious doubts as to the truth of Billingsley's statements. Sewell also charges the defendants with malice toward him because, as Billingsley acknowledged in his testimony, Sewell had adopted an Islamic first name due to his conversion to that religion. But Billingsley testified that initially he did not tell Cindy Morley about this, and that, when he later brought it up, they both agreed it was not pertinent. Moreover, the articles make no mention of this. Under these circumstances, the evidence is insufficient to support a finding of malice by the defendants on this basis, or on any other urged by Sewell.

Defendants were thus entitled to summary judgment on Sewell's invasion of privacy claim. It follows that they were also entitled to summary judgment on his claim for "intentional" infliction of emotional distress.

---

[27] *Davis v. Shavers*, 225 Ga. App. 497, 501 (3) (484 SE2d 243) (1997) (citations and punctuation omitted), aff'd, 269 Ga. 75 (495 SE2d 23) (1998).

*Judgment affirmed in part and reversed in part. Andrews, P. J., and Mikell, J., concur.*

DECIDED NOVEMBER 4, 2005 — 

*K. Prabhaker Reddy*, for appellant.
*Tyron C. Elliott*, for appellees.