S02G0361. MATHIS v. CANNON.
(573 SE2d 376)

</div>

FLETCHER, Chief Justice.

This libel action involves the interplay between the constitutional right of free speech under the First Amendment and an individual's right to protect his reputation. Bruce Mathis, a Crisp County

resident, posted three inflammatory messages about Thomas C. (Chris) Cannon on an Internet bulletin board as part of a local controversy concerning the unprofitable operation of a solid waste recovery facility in Crisp County. Three weeks later, without seeking a retraction, Cannon sued Mathis for libel per se and sought general and punitive damages. The trial court denied summary judgment to Mathis and granted partial summary judgment on liability to Cannon. The Court of Appeals of Georgia affirmed.[1] It held that the three messages constituted libel per se, Cannon was not a limited-purpose public figure, and Cannon was not required to seek a retraction before recovering punitive damages. We granted Mathis's petition for certiorari to review whether the court of appeals erred in affirming the trial court's ruling. We conclude that Cannon is a limited-purpose public figure, within the context of the public controversy surrounding the Crisp County facility, and his failure to seek a retraction before filing his complaint precludes him from recovering punitive damages. Therefore, we reverse.

## THE CRISP COUNTY SOLID WASTE RECOVERY FACILITY

1. OCGA § 9-11-56 provides that a judgment shall be rendered if the record shows that there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. In reviewing the trial court's grant of Cannon's motion for partial summary judgment, we must construe the facts in the light most favorable to Mathis, as the person opposing the motion.[2]

The Solid Waste Management Authority of Crisp County began meeting in March 1994 to develop a project to process and recycle solid waste and create jobs for county residents. Composed of the five Crisp County commissioners and two private citizens, the authority planned to construct a solid waste material recovery facility. The project was designed to separate residential and commercial garbage or solid waste, sell the recyclable "materials of value," and produce commercial compost from the organic materials, with the residual waste being deposited in the county's landfill. Initial projections required the facility to process a minimum of 1,200 tons of solid waste daily (later reduced) to be financially feasible. Because the county did not generate that amount of solid waste, the authority immediately began soliciting commitments from cities and counties to serve as waste providers.

Chris Cannon began attending the authority's monthly meetings in October 1994 as majority owner and president of TransWaste Ser-

---

[1] Seè *Mathis v. Cannon*, 252 Ga. App. 282 (556 SE2d 172) (2001).
[2] See *Cox Enterprises v. Nix*, 274 Ga. 801, 804 (560 SE2d 650) (2002).

vices, Inc., a company that he had recently formed to collect solid waste in southwest Georgia communities. He became a key player in helping the authority obtain the minimum tonnage of solid waste necessary for financing the project. The authority minutes show that Cannon helped solicit business from prospective cities and counties, negotiated with these communities about the authority's solid waste services, and secured and delivered contracts to them. In addition, his company loaned money to the authority and in one instance directly paid $450,000 on behalf of the authority to the City of Warner Robins to buy equipment that the authority had agreed to purchase to obtain the city's contract. In February 1996, the authority formally approved a 25-year Waste Collection and Transportation Agreement making Cannon's company the exclusive hauler to collect and transport solid waste from the participating communities to Crisp County.

The solid waste recovery plant began operating in May 1998. At its open house in July 1998, the authority described its $70 million facility as "a state-of-the-art-integrated waste processing and composting operation" — "the only one of its kind in the United States." The facility was located on 52 acres and consisted of five buildings, the adjacent county-owned landfill, a composting facility, and a greenhouse.

Despite the optimism and fanfare surrounding the plant's opening, the facility was never able to perform as predicted, failing from the beginning to generate sufficient revenue to cover its expenses. In December 1998, the authority fired its executive director and laid off employees. It subsequently hired a private management firm, which had just been started by former county administrator Bill Goff, to manage the plant.

Because of the plant's continuing financial problems, the authority made several controversial decisions during its first 18 months of operation. Reversing prior policies, for example, the authority voted to accept out-of-state waste and used prison labor for three months until the state attorney general ruled that the practice was illegal. Problems encountered in processing solid waste at the recovery plant forced the authority to divert more waste to the landfill, causing the county-owned landfill to fill up faster than projected. In addition, the authority was not paying TransWaste for its services in collecting and hauling solid waste to the recovery plant or making total payments to the county for the costs of operating the landfill. In July 1999, the county commission voted to raise property taxes based on the costs related to the county's disposal of its garbage, which included a $93,600 monthly fee due to the authority.

These problems caused several county residents to form a citizens' group, the Crisp Watchdogs. Members of that group and other

residents, including Mathis, regularly attended authority and commission meetings, asked critical questions, and made negative statements about the authority's operations and finances. The Crisp Watchdogs announced a recall effort against three county commissioners, and a grand jury began investigating the authority.

In September 1999, three separate events highlighted the authority's troubled operations. First, authority members learned at their monthly meeting that the facility was still not profitable despite performing at its top capacity. Goff reported that the recovery plant was operating at its maximum capacity, which was only 75 percent of the advertised production goals, and was generating an average value of $12 per ton of recycled materials from municipal solid waste or wet garbage, which was well below the projected value of $38 to $42 per ton. Second, the county commission voted to expand the county landfill to accommodate the 550 tons of waste that Cannon's company, TransWaste, was hauling into the county daily under the authority's contracts with other cities and counties. Third, TransWaste sued the authority for $2.25 million that the authority owed under a promissory note and its contract with TransWaste.

On November 1, the grand jury issued a report recommending that the authority do a better job informing the public about its finances, operations, and plans. Three days later, TransWaste stopped all deliveries of solid waste to the recovery plant after Cannon learned that the authority had paid $220,000 to the county instead of paying towards its debt with TransWaste. Cannon's decision to stop deliveries to the authority precipitated a crisis.

That evening, by coincidence, Mathis posted three messages on Yahoo's electronic message board for Waste Industries, Inc., the company that acquired TransWaste through a merger. Mathis had just read the grand jury's report and the news articles about it. His first message, posted at 11:14 p.m., stated:

**what u doing???**
by: *duelly41*

does wwin think they can take our county – stop the trash flow cannon we would love u for it – our county not a dumping ground and sorry u and lt governor are mad about it – but that is not going to float in crisp county – so get out now u thief

The second message, posted at 11:27 p.m., stated:

**cannon a crook????**
by: *duelly41*

explain to us why us got fired from the calton company please???? want hear your side of the story cannon!!!!!!!!

The third message, posted at 11:52 p.m., stated:

**cannon a crook**
by: *duelly41*

hey cannon why u got fired from calton company???? why does cannon and lt governor mark taylor think that crisp county needs to be dumping ground of the south??? u be busted man crawl under a rock and hide cannon and poole!!! if u deal with cannon u a crook too!!!!!!! so stay out of crisp county and we thank u for it

On November 9, the authority met in an emergency executive session to discuss the TransWaste litigation. Two days later, the authority held a specially called public meeting at which it asked Cannon to appear. Before discussing the lack of deliveries, the authority's chairman read a letter from Goff terminating his firm's management of the solid waste recovery facility, effective immediately, because his management team had been excluded from the authority's recent executive sessions. On November 12, the authority voted to reduce its operations and laid off three-fourths of its employees to meet its payroll. As one member described the situation, "[W]e don't have the money, the county is not getting paid, the hauler is not getting paid, we don't have the cash reserves in the bank, [and] we don't have any way to borrow any funds." At a meeting on November 15, reportedly held in violation of the Open Meetings Act, the authority hired the former plant manager as its executive director.

## LIBEL PER SE

2. At common law, libel was a strict liability tort that did not require proof of falsity, fault, or actual damages.[3] Since the United States Supreme Court's decision in *New York Times Co. v. Sullivan*,[4] the law of defamation has undergone substantial changes.[5] The Restatement now lists four elements in a cause of action for defamation: (1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged communication to a third party; (3) fault by the defendant amounting at least to negligence; and (4) special harm or

---

[3] See generally 2 Fowler V. Harper, Fleming James, Jr., and Oscar S. Gray, *The Law of Torts* § 5.0 (2d ed. 1986).
[4] 376 U. S. 254 (84 SC 710, 11 LE2d 686) (1964).
[5] See Restatement (Second) of Torts (1977) div. five, ch. 24-27 special note.

the "actionability of the statement irrespective of special harm."[6] When, as here, a libel action involves a speech of public concern, a plaintiff must show that the defendant published a defamatory statement about the plaintiff,[7] the defamatory statement was false,[8] the defendant was at fault in publishing it,[9] and the plaintiff suffered actual injury from the statements.[10]

The first issue in this case concerns whether the trial court and court of appeals adopted the proper standard of liability for the element of fault. If Cannon is a private figure, as both courts held, then a negligence standard applies.[11] If he is a public figure, as the defendant contends, then the more stringent standard from the *New York Times* case applies.[12]

## LIMITED-PURPOSE PUBLIC FIGURE

3. In *New York Times v. Sullivan*, the Court held that the constitutional guarantees of free speech and free press prohibited a public official from recovering damages for defamatory criticism of his conduct unless the official proves the statement was made with "actual malice."[13] This standard requires the public official to prove that the defendant had knowledge that the statement was false or was made with reckless disregard of whether it was true or false.[14]

Three years later in *Curtis Publishing Co. v. Butts*,[15] a majority of the Court applied the *New York Times* rule on actual malice to criticism of "public figures," defined as individuals who are "intimately

---

[6] See id. at § 558.

[7] See *Cox Enterprises*, 274 Ga. at 803 (holding newspaper entitled to summary judgment because news article did not suggest that plaintiff was one of the lawyers who had engaged in criminal conduct).

[8] See *Philadelphia Newspapers v. Hepps*, 475 U. S. 767, 776 (106 SC 1558, 89 LE2d 783) (1983); see also *Cox Enterprises v. Thrasher*, 264 Ga. 235 (442 SE2d 740) (1994) (granting summary judgment to newspaper because private-figure plaintiff could not carry her burden of proving the statement on a matter of public concern was false).

[9] See *Gertz v. Robert Welch, Inc.*, 418 U. S. 323 (94 SC 2997, 41 LE2d 789) (1974); see also *Hepps*, 475 U. S. at 776 (private-figure plaintiff bears burden of showing falsity and fault when speech concerns a matter of public interest).

[10] See *Gertz*, 418 U. S. at 347-348 (First Amendment prohibits awards of presumed and punitive damages when private individual sues publisher for a libel involving a matter of public concern). Cf. *Dun & Bradstreet v. Greenmoss Builders*, 472 U. S. 749, 763 (105 SC 2939, 86 LE2d 593) (1985) (permitting private individual to recover presumed and punitive damages when defamatory statements do not involve matters of public concern).

[11] See *Triangle Publications v. Chumley*, 253 Ga. 179 (317 SE2d 534) (1984) (adopting a standard of ordinary care when a private figure sues a newspaper for defamation); see also *Ellerbee v. Mills*, 262 Ga. 516 (422 SE2d 539) (1992) (affirming jury verdict for private-figure plaintiff who proved nonmedia defendant failed to exercise ordinary care).

[12] See *Hepps*, 475 U. S. at 775.

[13] See *New York Times*, 388 U. S. at 279-280.

[14] See id. at 280.

[15] 388 U. S. 130 (87 SC 1975, 18 LE2d 1094) (1967).

involved in the resolution of important public questions or, by reason of their fame, shape events in areas of concern to society at large."[16] The Court found that Wally Butts, the University of Georgia athletic director, had attained his status as a public figure by his position alone; the second plaintiff, a retired army officer, had achieved public figure status "by his purposeful activity amounting to a thrusting of his personality into the 'vortex' of an important public controversy," the racial integration of the University of Mississippi.[17] The rationale for extending the constitutional privilege to protect criticism of public figures was the increasingly blurred distinctions between the governmental and private sectors: "In many situations, policy determinations which traditionally were channeled through formal political institutions are now originated and implemented through a complex array of boards, committees, commissions, corporations, and associations, some only loosely connected with the Government."[18]

Later declining to apply the *New York Times* standard of fault in cases involving private-figure plaintiffs, the Court in *Gertz v. Robert Welch, Inc.* explored the difference between public figures and private persons in defamation cases involving statements of public concern.[19] The Court explained that some persons may hold positions with such pervasive fame or power that they are deemed public figures for all purposes,[20] but more often "an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues."[21]

Whether a person is a public figure is a question of law that requires the court to review the nature and extent of the individual's participation in the specific controversy that gave rise to the defamation.[22] The court of appeals has adopted a three-part analysis used in federal cases to determine whether an individual is a limited-

---

[16] See id. at 164 (Warren, C. J., concurring in the result).

[17] Id. at 155.

[18] See id. at 163 (Warren, C. J., concurring in the result).

[19] See 418 U. S. at 345; see also *Milkovich v. Lorain Journal Co.*, 497 U. S. 1, 15 (110 SC 2695, 111 LE2d 1) (1990) (*Gertz* involved a private person attempting to prove he was defamed on matters of public interest).

[20] See, e.g., *Williams v. Trust Co. of Ga.*, 140 Ga. App. 49, 54 (230 SE2d 45) (1976) (concluding Hosea Williams was a public figure based on his civil rights and labor activities, campaigns for public office, hosting of a radio program, participation in public demonstrations, appeals for public support, and statements on subjects of public interest).

[21] See *Gertz*, 418 U. S. at 351; see also *Atlanta Journal-Constitution v. Jewell*, 251 Ga. App. 808, 818-819 (555 SE2d 175) (2001) (finding Richard Jewell a limited-purpose public figure in connection with the 1996 bombing of the Centennial Olympic Park); *Byers v. Southeastern Newspaper Corp.*, 161 Ga. App. 717 (288 SE2d 698) (1982) (concluding dean at state college was a limited-purpose public figure in dispute on the proposed elimination of his position).

[22] See *Gertz*, 418 U. S. at 352; *Rosenblatt v. Baer*, 383 U. S. 75, 88 (86 SC 669, 15 LE2d 597) (1966).

purpose public figure.[23] Under this analysis, a court "must isolate the public controversy, examine the plaintiff's involvement in the controversy, and determine whether the alleged defamation was germane to the plaintiff's participation in the controversy."[24]

Applying this analysis, we conclude that Cannon is a limited-purpose public figure in the controversy surrounding the recycling facility and landfill in Crisp County. The public controversy concerns the Solid Waste Management Authority of Crisp County's financially unsuccessful operation of its solid waste recovery facility and resulting strain on the county's resources and its taxpayers. After 18 months of operation, the plant was not able to process the solid waste or produce the recyclable materials and commercial compost as projected. As a result, a large amount of solid waste that was collected from other locations for processing at the authority's plant was instead being diverted to the county landfill. The county commission voted to raise property taxes to deal with the costs related to disposing of the county's own waste and expand the county-owned landfill to accommodate the additional solid waste that TransWaste was bringing into the county under its contract with the authority.

In reviewing Cannon's role, we find that he was involved in the public controversy in Crisp County in at least three ways. First, he was a crucial actor in helping the authority obtain the commitments from other county and city governments in south Georgia to provide solid waste for the authority's facility. Without these early commitments, the authority would not have been able to obtain the construction loans necessary to go forward with the project.

Second, Cannon represented the authority in a variety of ways that far exceeded the terms of TransWaste's contract to collect and haul solid waste to Crisp County. As he explained in his deposition, the authority in 1996 was still "just a shell of an authority developing a concept," with no funding, lines of credit, or buildings. "TransWaste would step in to try to help the Authority in whatever way they could, and there are many, many instances of that." Although he described his position as an independent contractor who functioned as "the garbage man of the deal," it is difficult to distinguish between his efforts on behalf of the public authority and his efforts on behalf of his private company. Using his personal contacts with city and county officials developed from selling them heavy-duty equipment, Cannon solicited business for the authority; this solicitation helped generate business for TransWaste as the authority's exclusive hauler.

---

[23] See *Jewell*, 251 Ga. App. at 817 (adopting test used in *Silvester v. American Broadcasting Cos.*, 839 F2d 1491, 1494 (11th Cir. 1988)); *Waldbaum v. Fairchild Publications*, 627 F2d 1287, 1296-1298 (D.C. Cir. 1980) (setting out the three-step inquiry).

[24] *Jewell*, 251 Ga. App. at 817.

He negotiated the authority's contracts with local governments who provided waste, borrowed money through TransWaste and wrote a check directly to the City of Warner Robins for equipment that the authority had agreed to purchase, wrote and signed correspondence on authority letterhead in his capacity as its solid waste hauler, and participated in some of the authority's executive sessions.

Third, Cannon precipitated the financial crisis in November 1999 by filing a lawsuit against the authority and then temporarily halting deliveries to the solid waste recovery plant. TransWaste's actions in stopping deliveries forced the authority to address its financial and legal problems. Moreover, Cannon knew, or should have known, that suing the authority for payment for services rendered would affect the county as the other major participant in the project.

Based on Cannon's role in developing the project, representing the authority, and accelerating the crisis, we conclude that he voluntarily injected himself into the controversy or, at a minimum, became drawn into the public controversy over the operation of the authority's facility and county's landfill. Contrary to the dissent's analysis, it is not the global nature of the public's interest that defines a dispute as a public controversy, but rather whether the issue generates discussion, debate, and dissent in the relevant community, which in this case happens to be a county. Having blurred the distinction between his work for his private business and his more public efforts in helping develop the quasi-governmental project, he should not be able to erect a barrier to public criticism of his role once the project failed to perform as planned.

Finally, we determine that Mathis's statements were germane to Cannon's participation in the controversy. Mathis posted his message on the Internet bulletin board of Waste Industries, Inc., TransWaste's parent company, three days after the Crisp County grand jury issued its report on the authority. In his messages, he attacked "wwin" and its chief executive officer; told Cannon to "stop the trash flow" because "our county [is] not a dumping ground"; questioned why Cannon and the lieutenant governor, whose family owned a minority interest in TransWaste, "think that crisp county needs to be dumping ground of the south???"; and urged others to stay out of the county "and we thank u for it." Although the messages accused Cannon of being a crook and a thief and asked why he had been fired from a specific company, these accusations were made as part of the ongoing debate about the garbage disposal dispute in Crisp County. Moreover, any person reading the postings on the message board — written entirely in lower case replete with question marks, exclamation points, misspellings, abbreviations, and dashes — could not reasonably interpret the incoherent messages as stating actual facts about

Cannon, but would interpret them as the late night rhetorical outbursts of an angry and frustrated person opposed to the company's hauling of other people's garbage into the county.[25]

In sum, we conclude that the nature and extent of Cannon's participation in the local controversy concerning solid waste disposal has made him a limited-purpose public figure. This conclusion means that he must meet the standard of fault established in the *New York Times v. Sullivan* case. Under that standard, Cannon must show by clear and convincing evidence that Mathis published false and defamatory statements knowing that they were false or acting in reckless disregard of their truth or falsity.[26] Because the trial court and the court of appeals did not apply this standard of fault, Cannon was not entitled to summary judgment on the issue of liability.

## RETRACTION STATUTE

4. In addition to granting Cannon partial summary judgment, the trial court also denied Mathis summary judgment, rejecting his contention that Cannon's failure to seek a retraction means he cannot recover punitive damages. The second issue in this case is whether the retraction statute applies to a "publication" involving the Internet and a non-media defendant, like Mathis, or applies solely to the written publications of the traditional print media.

Although the dissent suggests that we should avoid deciding this issue because "it is not properly before this Court," the Georgia Constitution gives this Court the power to "review by certiorari cases in the Court of Appeals which are of gravity or great public importance."[27] In this case, the trial court and court of appeals decided the retraction statute issue, Mathis and Cannon briefed the issue in seeking this Court's review, and Cannon and amici thoroughly argued the issue in their briefs after we granted certiorari. Under these circumstances, we choose to rule on the statutory interpretation issue, which involves a question of law, rather than allow an erroneous court of appeals' interpretation to stand as the law of this state.

OCGA § 51-5-11, the state retraction statute, provides that a plaintiff in any libel action shall not be entitled to any punitive dam-

---

[25] See *Milkovich*, 497 U. S. at 16-17 & 20 (discussing the line of cases providing constitutional protection for "rhetorical hyperbole," including a statement that a real estate developer engaged in "blackmail" during negotiations with a city); see also *Horsley v. Feldt*, 304 F3d 1125 (11th Cir. 2002) (a reasonable listener would not have taken the accusation of a conspiracy as a literal assertion that the plaintiff had actually conspired in the technical legal sense with the persons who murdered a doctor, thereby committing a felony).

[26] See *Gertz*, 418 U. S. at 342.

[27] See Ga. Const. art. VI, sec. VI, para. V.

ages if the defendant corrects and retracts the libelous statement "in a regular issue of the newspaper or other publication in question" after receiving a written demand. The relevant provisions state:

> (a) In any civil action for libel which charges the publication of an erroneous statement alleged to be libelous, it shall be relevant and competent evidence for either party to prove that the plaintiff requested retraction in writing at least seven days prior to the filing of the action or omitted to request retraction in this manner.
> (b) In any such action, the defendant may allege and give proof of the following matters, as applicable:
> (1) (A) . . . .
> (B) That the defendant, in a regular issue of the newspaper or other publication in question, within seven days after receiving written demand, or in the next regular issue of the newspaper or other publication following receipt of the demand if the next regular issue was not published within seven days after receiving the demand, corrected and retracted the allegedly libelous statement in as conspicuous and public a manner as that in which the alleged libelous statement was published.

There is a similar statute that applies in defamation actions involving a visual or sound broadcast.[28] Unlike the cases involving the Internet from other states cited by the dissent, the Georgia statute deals solely with claims for punitive damages in libel actions and does not affect an individual's right to sue for libel.

In construing the retraction statute, we consider the statutory language and legislative intent in enacting it. Generally we give words their ordinary signification, except that we construe words of art or words connected with a particular trade or subject matter according to their meaning within that subject matter or trade. " 'It is an elementary rule of statutory construction that a statute must be construed in relation to other statutes of which it is a part, and all statutes relating to the same subject-matter, briefly called statutes "in pari materia," are construed together.' "[29]

A review of the libel and slander code sections, of which the retraction statutes are a part, shows that the word "publication" is used in five different sections. OCGA § 51-5-1 defines libel as "a false

---

[28] See OCGA § 51-5-12 (2000) (dealing with retractions of defamatory statements made in a visual or sound broadcast).

[29] *Butterworth v. Butterworth*, 227 Ga. 301, 303-304 (180 SE2d 549) (1971) (citations omitted).

and malicious defamation of another" and requires that the "publication of the libelous matter is essential to recovery." OCGA § 51-5-2 defines "newspaper libel" as a "false and malicious defamation of another in any newspaper, magazine, or periodical" and also requires the "publication" of the libelous matter as essential to recovery. OCGA § 51-5-3 explains what constitutes publication of libel: "A libel is published as soon as it is communicated to any person other than the party libeled." OCGA § 51-5-10 refers to the "publication or utterance" of a statement. Finally, the retraction statute, OCGA § 51-5-11, uses the word in three places. Subsection (a) provides that the retraction statute applies in any "civil action for libel which charges the publication of an erroneous statement"; subsection (b) permits the defendant to prove that a retraction has been published "in a regular issue of the newspaper or other publication in question"; and subsection (c) permits the defendant to plead the "publication of the correction, retraction, or explanation" in mitigation.

The court of appeals in 1984 interpreted the provision "newspaper and other publication" in subsection (b) to mean a "written publication" produced by the "print media."[30] Although the language of the retraction statute provides some support for this interpretation, we find it problematic for several reasons. First, it ignores legislative history showing that the General Assembly adopted the phrase "other publication" as a substitute for "magazine or periodical" in the initial statute.[31] This change suggests that the legislature intended for the retraction statute to apply to more than "newspaper libel" as defined in OCGA § 51-5-2. Second, the court of appeals gives the same word, publication, a different meaning within the same code section and a meaning other than the one historically used in defamation law. Third, the court of appeals makes a distinction between media and nonmedia defendants that is difficult to apply and makes little sense when the speech is about matters of public concern.[32] Finally, the court's definition fails to accommodate changes in communications and the publishing industry due to the computer and the Internet.[33] For example, under its view the retraction statute

---

[30] See *Williamson v. Lucas*, 171 Ga. App. 695, 697 (320 SE2d 800) (1984); see also *Mathis*, 252 Ga. App. at 285 (plain language of statute does not apply to Internet postings).

[31] See 1939 Ga. Laws 343, 344 (initial retraction statute applied when the "newspaper, magazine or periodical" published a correction or retraction); 1958 Ga. Laws 54 (act provided a method of retraction in the "newspaper or publication" to relieve the defendant of liability for punitive damages); 1960 Ga. Laws 198, 199 (act modified retraction method to be used by a defendant "in a regular issue of the newspaper or other publication").

[32] See *Dun & Bradstreet*, 472 U. S. at 773 (White, J., concurring) ("the First Amendment gives no more protection to the press in defamation suits than it does to others exercising their freedom of speech").

[33] Cf. A. Chapar, Peach Sheet, *Torts: Defamation and Abusive Litigation*, 6 GA. ST. U.L. REV. 330, 331 & n. 8 (1989) (legislature enacted OCGA § 51-5-12 to fill the void in the statu-

would not apply to a story that appears only on the on-line version of a newspaper or an advocacy group's monthly electronic newsletter to its members reporting on congressional voting.

Moreover, we find unpersuasive the appellate court's rationale in this case for following the "plain language" of the retraction statutes.[34] Nothing in OCGA § 51-5-11 precludes applying the retraction statute to individuals. To the contrary, if the purpose of punitive damages in libel actions is to punish the speaker, it is fairer to prohibit punitive damages in actions brought against individuals, who may communicate a defamatory falsehood to one person, than to the traditional press, which publishes the defamatory statement to greater numbers of people. Also contrary to the court's reasoning, there is no guarantee that a retraction made by a newspaper, television station, or radio station would likely reach the same audience that heard the original defamatory statement. Therefore, a retraction posted on an Internet bulletin board is as likely to reach the same people who read the original message as any retraction printed in a newspaper or spoken on a broadcast. For these reasons, we reject the definition of the court of appeals as overly restrictive.

Instead, we construe the word "publication" in subsection (b) of the retraction statute as meaning a communication made to any person other than the party libeled.[35] Under this interpretation, the retraction statute applies to the words that Mathis wrote in his messages posted on the bulletin board of Waste Industries, Inc. The practical effect of this decision is to require all libel plaintiffs who intend to seek punitive damages to request a correction or retraction before filing their civil action against any person for publishing a false, defamatory statement.

Our reasons for preferring this broader reading are many. This construction makes the same word mean the same thing in all the libel and slander code sections. It treats a publication for purposes of seeking a retraction the same as a publication for purposes of imposing liability. It acknowledges that the legislature extended the retraction defense originally created for newspapers, magazines, and periodicals to include newspapers and "other publications." It encourages defamation victims to seek self-help, their first remedy, by "using available opportunities to contradict the lie or correct the error and thereby to minimize its adverse impact on reputation."[36] It eliminates

---

tory scheme created by the decision in *Williamson v. Lucas* limiting OCGA § 51-5-11 only to the print media).

[34] See *Mathis*, 252 Ga. App. at 285-286.

[35] See OCGA § 51-5-3; Restatement (Second) of Torts § 577 (1977); see also Black's Law Dictionary 1242 (7th ed. 1999) (defining "publication" under defamation law as the "communication of defamatory words to someone other than the person defamed").

[36] See *Gertz*, 418 U. S. at 344.

the difficult task of determining what is a "written publication" and who is the "print media" at a time when any individual with a computer can become a publisher.[37] It supports free speech by extending the same protection to the private individual who speaks on matters of public concern as newspapers and other members of the press now enjoy. In short, it strikes a balance in favor of "uninhibited, robust, and wide-open" debate in an age of communications when "anyone, anywhere in the world, with access to the Internet" can address a worldwide audience of readers in cyberspace.[38]

Applying our decision to the facts here, we find that Cannon asked the Internet service provider Yahoo! to delete the three messages that Mathis posted, but did not ask Mathis to correct or retract any of his statements. Because it is undisputed that Cannon did not request a correction or retraction in writing before filing his complaint, he is not entitled to recover punitive damages from Mathis for any defamatory statements posted on the bulletin board on the Internet.

*Judgment reversed. All the Justices concur, except Hunstein, Carley and Hines, JJ., who dissent.*

HUNSTEIN, Justice, dissenting.

Today, the majority holds Bruce Mathis, a defamation defendant, wholly unaccountable for damaging statements he made on an Internet discussion forum about a private individual, Thomas C. Cannon. In my opinion, Mathis should be held accountable for speech that exceeded the scope of legitimate criticism and instead fell within the range of reckless falsehoods against a private-plaintiff. Moreover, I take issue with the majority holding that Cannon is precluded from recovering punitive damages because he failed to request a retraction of Mathis' defamatory remarks.

Cannon sued Mathis for clearly actionable remarks he made about him on a financial message board that allows access to financial and other information about a corporation in which an individual has a particular interest:

From a First Amendment perspective, the financial message

---

[37] See *Reno v. American Civil Liberties Union*, 521 U. S. 844, 853 (117 SC 2329, 138 LE2d 874) (1997) ("Web publishing is simple enough that thousands of individual users and small community organizations are using the Web to publish their own personal 'home pages,' the equivalent of individualized newsletters about that person or organization, which are available to everyone on the Web.").

[38] See *Reno*, 521 U. S. at 851-853; *New York Times*, 376 U. S. at 279; see also *Zeran v. America Online*, 129 F3d 327 (4th Cir. 1997) (federal Communications Decency Act of 1996 barred action against interactive computer service that refused to post retractions of offensive messages written by a third party).

> boards contribute to the marketplace of ideas by encouraging citizens to participate in public decision making. . . . At a minimum, therefore, the boards provide an avenue for citizens to converse with one another and to seek consensus about topics that affect their lives.

Lidsky, *Silencing John Doe: Defamation & Discourse in Cyberspace*, 49 Duke L. J. 855 (2000). The issues raised in this case are whether the comments posted by Mathis, an outspoken opponent of the Solid Waste Management Authority, exceeded the "marketplace of ideas" that the First Amendment seeks to protect, see *Red Lion Broadcasting Co. v. F.C.C.*, 395 U. S. 367, 390 (89 SC 1794, 23 LE2d 371) (1969), and if so, in seeking recovery on those comments, whether Cannon is a private or limited-purpose public figure.

The majority erroneously concludes that Cannon is a limited-purpose public figure within the context of the public controversy surrounding the landfill in Crisp County. In *Gertz v. Robert Welch, Inc.*, 418 U. S. 323, 345 (94 SC 2997, 41 LE2d 789) (1974), the U. S. Supreme Court defined "public figures" as people who

> have assumed roles of special prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classified as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved.

Id. As noted by the majority, in Georgia, a plaintiff is a limited-purpose public figure if the facts satisfy the three-prong test set forth in *Atlanta Journal-Constitution v. Jewell*, 251 Ga. App. 808, 816-820 (555 SE2d 175) (2001). In determining that Cannon is a limited-purpose public figure, the majority identifies Cannon as a "crucial actor" in helping to develop and finance the project and describes his conduct as "exceeding the terms of TransWaste's contract to collect and haul solid waste to Crisp County." The majority also relies on Cannon's lawsuit against the Authority, concluding that Cannon precipitated the county's financial crisis by the filing of TransWaste's lawsuit against the Authority. The record reflects, however, that TransWaste was the sole waste hauler for the Authority and that Cannon, as president of the company, was merely fulfilling the duties of his office and performing his obligations under the contract with the Authority when he conducted the activities cited by the majority. For example, the Authority required that all business and correspondence relating to its contracts be conducted under the Authority's

name and on Authority letterhead. Therefore, Cannon signed his name, identifying his role as "Waste Services Provider" on Authority letterhead, only in correspondence addressing Authority projects. Moreover, TransWaste had a reasonable business interest in making sure the Authority obtained city contracts early on for the Waste facility. In one instance, TransWaste borrowed $450,000 to enable the Authority to obtain a city contract that would be serviced by Trans-Waste. Upon receiving funding, the Authority repaid the waste hauler. Their activities, as well as Cannon's attendance at public meetings about the county landfill operation, constitute reasonable professional conduct by the president of the Authority's sole waste provider. The conduct in no way elevated Cannon as an individual to the level of a "public figure" as defined in *Gertz* and applied in *Jewell*.

Similarly, Cannon's resort to judicial litigation upon the county's alleged breach of contract cannot be used as a factor to determine whether Cannon is a limited-purpose public figure. In *Time, Inc. v. Firestone*, 424 U. S. 448, 454-457 (96 SC 958, 47 LE2d 154) (1976), one of only three cases[39] since *Gertz* in which the U. S. Supreme Court has addressed the limited-purpose public figure doctrine, the Supreme Court refused to rely on subject matter classifications, such as "judicial proceeding," to determine the extent of constitutional protections afforded defamatory falsehoods.

Finally, the fact that the issues concerning the landfill may have been of public interest does not make Cannon a public figure. Not all issues that spark public debate constitute a public controversy. Each case cited by the majority in which plaintiffs were found to be limited-purpose public figures involved significant social events occurring on the state, national, or international level. In *Curtis Publishing Co. v. Butts*, 388 U. S. 130 (87 SC 1975, 18 LE2d 1094) (1967), the defendant magazine accused the athletic director of the University of Georgia of conspiring to "fix" a football game. In *Associated Press v. Walker*, 388 U. S. 140 (87 SC 1975, 18 LE2d 1094) (1967), a former U. S. army general personally led students in an attack on law enforcement who were enforcing a desegregation order. Finally, the *Jewell* case involved the 1996 bombing of the Olympic Games, which resulted in Jewell initially being hailed as a hero for his role in discovering the bomb and evacuating bystanders and Jewell's participation in national television and print interviews and his use of a media "handler." The case at hand, however, involving a county-wide debate about a local landfill project, simply does not rise to the level

---

[39] The other two cases in which the Supreme Court considered and ruled on the issue finding that plaintiffs were private, not limited-purpose public figures are *Wolston v. Reader's Digest Assoc.*, 443 U. S. 157 (99 SC 2701, 61 LE2d 450) (1979) and *Hutchinson v. Proxmire*, 443 U. S. 111 (99 SC 2675, 61 LE2d 411) (1979).

of the Centennial Olympic Park bombing, racial desegregation in America, or even a state university's controversy about whether the university's athletic director fixed an SEC game.

The facts of this case also fail to establish the third prong of the test outlined in *Jewell* for determining whether under Georgia law a person is a limited-purpose public figure. Under this prong, the court must determine whether the alleged defamation was germane to the plaintiff's participation in the controversy. The majority summarily determines that Mathis' statements were germane to the local landfill debate because the first message made vague references to the controversy. The majority determines, therefore, with no further analysis, that the false accusations that Cannon was a crook and thief and had been fired from the Carlton company were "made as part of the ongoing debate about the garbage disposal dispute in Crisp County." In fact, many of the statements against Cannon have absolutely no relevance to the landfill project. In the first message, Mathis states, "so get out now u thief." The second message makes no reference to Crisp County or garbage dumping whatsoever but directly and falsely accuses Cannon of being fired from a previous job and demands an explanation. Finally, the third message, posted nearly 30 minutes later, reiterates the accusation that Cannon was fired and states that anyone dealing with Cannon is also a crook. A reasonable reader of these messages would not conclude that such false and inflammatory statements constitute public criticism of Cannon's work on the landfill project, but would consider them to be assertions of fact constituting malicious and personal attacks on Cannon's character and reputation. When Mathis posted these three Internet messages on Yahoo!, he was personally attacking Cannon using a method of broadcast that reaches far beyond Crisp County and those who possessed knowledge of the local landfill operation. The messages posted by Mathis under a pseudonym on the Yahoo! message board dedicated to the discussion of Waste Industries, Inc. and targeted to a receptive audience far exceeded mere hyperbole or exaggeration. Mathis' messages contained accusations of dishonesty and criminality on the part of Cannon. Therefore, because the record demonstrates that Cannon was not a prominent figure in the controversy, he had no control over those aspects of the facility involved in the controversy, and he did not avail himself of the media in an effort to comment on or influence the outcome of the debate concerning the controversy, I would affirm the Court of Appeals' determination that Cannon was not a limited-purpose public figure.

Nor can I agree with the majority's consideration of OCGA § 51-5-11, the retraction statute, so as to preclude Cannon's claim for punitive damages. As a procedural matter, the retraction issue is not properly before this Court. Mathis did not enumerate as error the

Court of Appeals' ruling on the applicability of OCGA § 51-5-11 and his briefs are equally devoid of any argument or citation to authority on the issue. Under our own Supreme Court rules, the issue either is not before the Court or was abandoned by Mathis by his failure to raise it in his briefs. See USCR 22. Accordingly, the majority's decision as to the application of OCGA § 51-5-11 to this case constitutes nothing more than an improper advisory opinion.

I further take issue with the majority's expansive rewriting of the retraction statute to make it applicable to any and all "communications of defamatory words to someone other than the person defamed." Had the legislature intended to require a retraction for every defamatory publication and every libel defendant, as the majority holds today, it could have done so. Instead, in plain and unequivocal language, the legislature limited the application of the retraction statute to defendants who regularly publish information by mandating that the libel defendant correct and retract the allegedly libelous statement in the "next regular issue of the newspaper or other publication" following receipt of the demand for retraction. OCGA § 51-5-11 (b) (1) (B). The limiting language chosen by the legislature is consistent with its intent in enacting the statute "to provide for a method of retraction of libelous statements made by newspapers which shall relieve such newspapers from liability for punitive damages." Ga. Laws 1958, p. 54. The retraction provision was subsequently amended to apply not only to newspapers, but newspapers and "other publications." See Ga. L. 1960, p. 198, § 1.

Where the language of an act is plain and unequivocal, judicial construction is not only unnecessary but is forbidden. *City of Jesup v. Bennett*, 226 Ga. 606 (2) (176 SE2d 81) (1970). The plain language of OCGA § 51-5-11 requires a request for a retraction as a precondition to the recovery of punitive damages only against libel defendants who disseminate information or engage in discourse on a regular basis through newspaper, magazine, or other publication. See *Williamson v. Lucas*, 171 Ga. App. 695 (4) (320 SE2d 800) (1984). Thus, according to its plain language, OCGA § 51-5-11's requirement that the retraction be placed in the "next regular issue" has no application to an individual libel defendant who, like Mathis, on a single occasion posted electronic messages in an Internet chat room. See generally *Zelinka v. Americare Healthscan*, 763 So2d 1173 (Fla. Ct. App. 2000) (statutory pre-suit notice and retraction requirements not applicable to private individual who posted message on Internet message board); *It's In the Cards, Inc. v. Meneau*, 535 NW2d 11 (Wis. Ct. App. 1995) (retraction statute did not preclude claim for defamation based on messages posted to Internet message board). That is not to say that the retraction statute is entirely inapplicable to Internet

publications of defamatory statements. To the contrary, there may well be circumstances where an individual or media defendant who regularly publishes an Internet newspaper, magazine or other publication will be subject to the mandatory provisions of the retraction statute, but that is not the case here. Mathis is a private individual who posted three defamatory messages in an Internet chat room and who is entirely incapable of complying with the statute's requirement that a retraction be published in the "next regular issue." Accordingly, if the issue were properly before this Court, I would agree with the Court of Appeals that the retraction provision of OCGA § 51-5-11 is inapplicable to the facts of this case.

In my view, the majority ruling which asks no self-censorship of an Internet poster is unconscionable in that it allows Internet users free reign to injure the reputations of others, even when the statements cross the bounds of propriety. I believe we are better served by applying our laws so that they do not threaten legitimate criticism or deter Internet users from speech that is truthful and non-defamatory, while protecting private individuals from cyberspace posters, like Mathis, who use the Internet to seek to foster the "poisonous atmosphere of the easy lie." *Rosenblatt v. Baer*, 383 U. S. 75, 94 (86 SC 669, 15 LE2d 597) (1966).

I am authorized to state that Justice Carley and Justice Hines join in this dissent.

DECIDED NOVEMBER 26, 2002 —
RECONSIDERATION DENIED DECEMBER 13, 2002.

*James W. Hurt & Associates, James W. Hurt, Thomas H. Hurt*, for appellant.

*Jones, Cork & Miller, Robert C. Norman, Jr., Hubert C. Lovein, Jr.*, for appellee.

*Powell, Goldstein, Frazer & Murphy, James C. Rawls, Eric P. Schroeder, Bondurant, Mixson & Elmore, Jeffrey O. Bramlett, Michael B. Terry, Hull, Towill, Norman, Barrett & Salley, David E. Hudson, King & Spalding, Jamie N. Shipp*, amici curiae.